## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**Tyrone Evans**,

     *Plaintiff,*

 v.

**NCB Management Services, Inc.,**

    *Defendants.*

Case No.: 8:21-cv-2188

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Tyrone Evans ("**Mr. Evans**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendant, NCB Management Services, Inc**.** ("**NCB**") stating as follows:

## PRELIMINARY STATEMENT

1.    This is an action brought by Mr. Evans against NCB for violations of the Florida *Civil Remedies for Criminal Practices Act*, Florida Statute § 772.101, *et. seq.* ("**CRCPA**"),   the *Fair Credit Reporting Act*, 15 U.S.C. § 1681 et. seq. ("**FCRA**"),the *Florida Consumer Collection Practices Act*, Florida Statute § 559.55, *et. seq.* ("**FCCPA**") and the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et. seq.* ("**FDCPA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's FDCPA and FCRA claims arise under 15 U.S.C. § 1692k(d), and 15 U.S.C. § 1681n, and 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction for Plaintiff's CRCPA and FCCPA claims under 28 U.S.C. § 1367.

4.      The Defendants are subject to the jurisdiction of this Court pursuant to Section 48.193, Florida Statutes and Fed. R. Civ. P. 4(k).

5.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)(2), because the acts complained of were committed and / or caused by the Defendants within the Middle District of Florida

### PARTIES – Mr. Evans

6.      Mr. Evans is a natural person who at all times relevant has resided in Tampa, Florida.

7.      Mr. Evans is a *Consumer* as defined by 15 U.S.C. § 1692a(3) and Florida Statute § 559.55(8).

### PARTIES – NCB

8.      NCB is a Pennsylvania corporation with a primary business address of 1 Allied Drive, Trevose, PA 19053.

9.      NCB's Florida Registered Agent is CT Corporation System, 1200 S. Pine Island Rd., Plantation, FL 33324.

10.     NCB is a *Debt Collector* within the meaning of the FDCPA, 15 U.S.C. §1692a(6), in that it: (a) uses an instrumentality of commerce, including postal mail, interstate and within the State of Florida, for its business, the principal purpose of which is the collection of debts; and, (b) regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

11.     NCB is licensed as a **Consumer Collection Agency** ("**CCA**") by the Florida Office of Financial Regulation and holds license number **CCA0900866**. **SEE PLAINTIFF'S EXHIBIT A.**

## FACTUAL ALLEGATIONS

### Elastic Makes Usurious Loan to Mr. Evans

12.     In or around October 2016, Mr. Evans obtained an installment loan (the "**Elastic Loan**") from the online lender Elevate Credit, Inc., ("**Elevate**") doing business as Elastic ("**Elastic**").

13.     Elevate is on online lender that operates through several websites, including www.risecredit.com, www.elastic.com, and www.elevate.com, to provide predatory, high-interest, short-term loans to consumers that it describes as individuals "with little to no savings, urgent credit needs and limited options."

14.     Elevate claims on its website it is "focused on developing solutions that can help customers end the cycle of debt and build a brighter tomorrow."

15.     But rather than help with lifting struggling consumers out of the hole created by household debt, Elevate provides the shovel to help them dig themselves in deeper, by marketing predatory, high-cost loans as supposed "lower-cost" alternatives that will "save" consumers money on financing costs. Elevate entices vulnerable consumers with the prospect of fast cash – often without disclosing the annual interest rates assessed— supposedly to keep the consumer from being charged high bank overdraft fees or payday loan costs. In reality, the consumer often ends up further mired in debt.

16.     The interest rates on Elastic loans have effective annual percentage rates ("**APRs**") between **129**% and **251**% annually.

17.     Mr. Evans received a direct-mail solicitation produced by Elevate and ended up taking out a $3,500 loan.

18.     Mr. Evans used the proceeds of the loan for household expenses.

19.     The Elastic Loan arose from the purchase of goods and services which were primarily for family, personal, or household purposes, specifically charges for consumer goods and services, and therefore meets the definition of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5) and the FCCPA, Florida Statute § 559.55(6).

20.     Florida Statute § 687.071(2) renders loans made with annual interest rates greater than 25% a second-degree misdemeanor.

21. Florida Statute § 687.071(3) renders loans made with annual interest rates greater than 45% a third-degree felony.

22. Florida Statute § 687.071(7) renders any loan in violation of Florida Statute § 687.701, and any debt stemming from such extension of credit, void and unenforceable.

23. The annual interest rate on the Elastic Loan exceeded **149% annually**.

24. The loan made by Elastic to Mr. Evans was thus *void ab initio*. *See Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966). *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

25. The Elastic loan is therefore an "unlawful debt" per Florida Statute § 772.102(2).

26. Florida law prohibits any recovery of the principal on such loans. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

### Elastic Engages in Rent-a-Bank Scheme with Republic Bank

27. Purportedly, the Elastic Loan was funded through **Republic Bank and Trust** ("**Republic Bank**")**,** a bank with primary offices in Louisville, Kentucky.

28.     However, Elevate was the real lender, not Republic Bank. Elevate, in an effort to avoid state usury laws, including Florida's, "partnered" with Republic Bank.

29.     Republic Bank, as a bank, is not subject to state interest rate limits pursuant to the National Bank Act.

30.     Elastic launders its loans through Republic Bank, claiming that Republic Bank is the true lending entity.

31.     Republic Bank was not the true lender of Mr. Evans's loan.

32.     Indeed, Republic Bank had virtually nothing to do with the marketing, underwriting, servicing, collection, and post-charge-off sale to defendant NCB.

33.     Elevate pre-screens and markets Elastic loans to consumers through websites, call centers, direct mail, and other marketing channels that Elevate solely operates. Elevate also creates the content of the marketing and advertising used to lure consumers into taking out a loan.

34.     Elevate itself pays all costs related to its extensive marketing campaigns.

35.     The Elastic trademark appearing on its website and used in virtually all of its marketing – is a registered trademark of Elastic Financial, LLC. **SEE PLAINTIFF'S EXHIBIT B.**

36.     Elastic Financial LLC is a subsidiary of Elevate.

37.     In its Elastic loan marketing, Elevate goes to great lengths to make it appear its loans are "cheaper" alternatives to other forms of financing, although in virtually all instances, it is not.

38.     Elastic's marketing and website states it charges borrowers an initial "advance fee" of $5 or $10 for each $100 advanced, as well as a fixed charge of 5% or 10% of the open balance in each payment period. The 5% fee is charged to consumers who make payments bi-weekly, with the 10% rate being assessed to those paying monthly. Like a payday loan, Elevate schedules repayments to coincide with the borrower's payday. Consumers and repay loans over as long as 20 months.

39.     One of the key advertising taglines of Elastic's marketing is that the loans are a cost-effective alternative which enables a consumer to "avoid expensive overdraft fees or bounced checks."

40.     Yet, in its 10-K[1], Elevate explains that "if an Elastic customer makes a $2,500 draw on the customer's line of credit and this draw required bi-weekly minimum payments of 5% (equivalent to 20 bi-weekly payments), and if all minimum payments are made, the draw would earn finance charges of $1,148."

---

[1] As a publicly-traded company, Elastic is required by the Securities and Exchange Commission to file a form 10-K yearly. The 10-K is a comprehensive report about a company's financial performance and contains much more detail than a company's annual report.

41.     The average bank overdraft fee is approximately $35. Thus, per Elevate's example of a consumer taking out a $2,500 loan, said consumer would have to of incurred more than 32 overdraft fees for bank overdraft fees to exceed the $1,148 cost of the Elastic loan.

42.     Elevate does not disclose the effective APR of its Elastic loans to consumers.

43.     Its website states Elastic "does not have an interest rate like other traditional credit products. Rather, you pay a cash advance fee plus 5% or 10% for every cash advance you request depending on your billing cycle."

44.     Elevate deducts the cash advance fee from the amount that it lends so that a consumer borrowing $500 with a 5% cash advance fee, would actually receive $475. Elevate also charges a 5% or 10% fee for each billing cycle in which the consumer has a balance. Elevate describes the recurring fee as a "Carried Balance Fee."

45.     Although Elevate does not disclose the effective APR for Elastic to consumers, it does calculate it for itself and its investors.

46.     Elevate's 10-K states that "[f]or the year ended December 31, 2018, [Elastic's] effective APR was 129%" . . . . and that for the year ended December 31, 2013, the effective APR for Elastic was 251%."

47.    A reasonable consumer would not understand that a loan with a disclosed 5-10% fee for each cash advance and repayment, has an effective APR of 129%.

48.    Elevate, in essence rents Republic to originate the loans that it ultimately controls and profits from through Elevate SPV ("**ESPV**"). In 2019, Elevate's revenue from the Elastic brand totaled approximately $248.5 million.

49.    Since 2015, ESPV, a Cayman Islands special purpose vehicle that operates for the financial benefit of Elevate, immediately purchases a 90% interest in Elastic loans, (including the principal and interest due) after origination "by" Republic Bank. This 90% ownership makes ESPV the legal and equitable owner of the receivables for the loans. Revenue from ESPV is funneled, though a series of transactions, back Elevate.

50.    Elevate's financial statements include "revenue, losses and loans receivable related to the 90% of Elastic loans originated by Republic and sold to ESPV."

51.    Elevate also takes the risk of bad debt concerning Elastic loans. Elevate provides credit protection to ESPV against Elastic loan losses, meaning that its capital, not Republic Bank's, is primarily at risk.  If a consumer were to default on a $1,000 loan and Elevate was unable to recover any payment at all, resulting in a total loss, Republic Bank would stand to lose, at the most, $50 (since

a minimum of 5% is withheld as a funding fee from the initial disbursement to a consumer) while Elevate could stand to close as much as $900.

52.     Additionally, Republic Bank's economic interests are protected due to its agreement with Elevate, which includes a stipulation that ESPV maintain cash collateral in a Republic Bank account to secure its obligations to purchase the Elastic loans supposed made "by" Republic Bank.

53.     Elevate Credit, through ones of its subsidiaries, also acts as the servicer for the Elastic loans. Elevate Credit reconciles the accounts, posts payments and other credits to the accounts, and provides periodic billing statements to consumers.

54.     As per Elastic's business model, once Republic Bank "made" the $3,500 loan to Mr. Evans, the loan was immediately assigned to Elastic.

55.     Elastic then proceeded to attempt to collect on the loan from Mr. Evans, including the 149% APR, Cash Advance Fees, and Carried Balance Fees.

56.      However, Elastic, a non-bank assignee of the Elastic Loan, had no legal ability to collect the assessed interest. *See*. *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).

57.     Elastic has been sued in the past for collection of unlawful debt and its use of Republic Bank in its "rent-a-bank" schemes. *See District of Columbia vs. Elevate Credit, Inc.*, case 1:2020cv01909, U.S.D.C., District of Columbia, July 2, 2020.

58.    Mr. Evans repaid over $1,000 directly to Elastic. Despite these payments, Elastic claimed Mr. Evans still owed $3,660 -- $160 more than the original loan amount.

### Elevate's Questionable History

59.    Elevate, the owner of Elastic, is a Fort Worth, Texas-based "FinTech" business which makes loans to consumers at interest rates illegal in the vast majority of states, including Florida.

60.    One of the founders of Elastic was Ken Rees ("**Rees**") who was, until his resignation in July 2019, also its CEO.

61.    Rees was previously the CEO of Think Finance, LLC ("Think Finance"), which made consumer loans at triple-digit interest rates.

62.    Initially, Think Finance "partnered" with the First Bank of Delaware to launder its loans to create the appearance they were issued by a state-chartered bank, to avoid state usury laws.

63.    In 2012, the First Bank of Delaware was later stripped of its bank charter and fined $15 million.

64.    Rees thereafter partnered with the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Box Elder, Montana and began laundering its loans – now re-branded "Plain Green Loans" – through the Tribe, claiming the Tribe's

sovereign immunity prevented civil and criminal action from being taken against it. Such agreements are often referred to as "rent-a-tribe" schemes.

65.     Plain Green's loans charged interest rates of up to 400% annually.

66.     After lawsuits filed against Think Finance by the Consumer Financial Protection Bureau, the Pennsylvania Attorney General, and others, relating to the wildly-usurious interest rates being charged by Plain Green, Rees formed Elevate Credit, Inc.

## NCB Attempts to Collect Usurious Elastic Loan from Mr. Evans

67.     On or about September 22, 2017, the Elastic Loan was sold to NCB.

68.     NCB has mailed multiple written collection communications to Mr. Evans in the last 12 months attempting to collect the Debt, including one dated October 22, 2020.

69.     NCB also reported the purported "debt" to the major consumer credit reporting agencies ("CRAs"), including Experian, monthly, beginning September 2017 and through December 2020. **SEE PLAINTIFF'S EXHIBIT C.**

70.     Reporting a debt to a CRA is an attempt to collect the debt alleged therein. *See, e.g., Edeh v. Midland Credit Management, Inc.,* 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless FDCPA cases,

that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

71.     NCB certified to the CRAs that the debt it was reporting as "in collection," with $3,660 past due, thereby indicating that the Elastic Loan was a legitimate, lawful debt.

72.     NCB knew, or should have known, that it was collecting illegal debt from Mr. Evans.

73.     NCB is a large debt buyer with a number of experienced lawyers advising it on consumer protection statutes.

74.     Beyond this, NCB was in possession of the original loan agreement documents creating the Debt.

75.     Mr. Evans suffered severe emotional distress in being subjected to illegal collection actions over a loan by NCB which she, pursuant to Florida law, does not owe.

76.     Mr. Evans's credit reports and scores have been severely and adversely negatively impacted from NCB's false reporting that he legitimately owes a debt for $3,660 to NCB.

77.     Around August 2020, Mr. Evans disputed NCB's reporting to Experian.

78.     Experian then sent NCB an *Automated Consumer Dispute Verification Request* ("**ACDV**"), asking NCB to make a reasonable investigation into the dispute.

79.     Upon receipt of the ACDV, NCB *knew* that Mr. Evans disputed the Debt.

80.     The ACDV was sent via e-OSCAR, an online system used by CRAs to communicate with furnishers of data, such as debt collectors like NCB.

81.     When responding to an ACDV through e-OSCAR, the person sending the response must electronically sign to confirm as follows:

> [b]y submitting this ACDV, you certify that you have verified the accuracy of the data in compliance with all legal requirements, and your computer and/or manual records will be adjusted to reflect the changes noted.

82.     NCB returned the ACDV to Experian, verifying that it had completed its investigation and that all of its information was accurate.

83.     NCB instructed Experian to report a Metro 2 *Compliance Condition Code* ("**CCC**") of "XH" meaning "account **previously** in dispute – investigation complete, reported by data furnisher." (**Emphasis added**.)

84.     In cooperation with the major CRAs, the *Consumer Data Industry Association* ("**CDIA**") publishes the Metro 2 reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting

products are used in more than nine billion transactions each year. *See* http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.

85.     The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA.

86.     The Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete, and timely data, and has developed the Metro 2 standards.

87.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit-risk scoring.

88.     Equifax and Experian require all data furnishers, such as NCB, to report data according to Metro II standards.

89.     NCB did not adhere to Metro 2 standards when it reported that the Debt was "previously disputed" since the "XH" CCC is applicable only to situations where information was disputed, and the consumer **later indicates to the data furnisher that his dispute has been resolved**.

90.     Failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of a willful violation of the FCRA. *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

91.     For a debt to be accurately reported as "*Previously in Dispute,*" the consumer must retract or cease his dispute.

92.     Mr. Evans never indicated, nor even implied, to NCB that he agreed that he owed the Debt and no longer disputed it.

93.     Thus, NCB had no reason to believe that the Debt was no longer disputed by Mr. Evans.

94.     Indeed, NCB had every reason to believe the opposite - that Mr. Evans actively disputed the Debt.

95.     The "plain language of the 'XH' code implies any dispute the consumer previously had about the account is settled, or a solution has been found." *Wood v. Credit One Bank*, No. 3:15-cv-594 (E.D. Va. Sept. 21, 2017).

96.     NCB could have reported a Metro II compliance condition code of "XB," meaning "consumer disputes this information," but it did not.

97.     When responding to an ACDV and indicating that information had been verified as accurate, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle v. Midland Credit Management, Inc.,* 827 F.3d 1295 (11th Cir. 2016).

98.     The failure to update a report to indicate that a debt is disputed can, in and of itself, violate the FCRA. *See Saunders v. Branch Banking and Trust Co. of VA*, 526 F.3d 142 (4th Cir. 2008).

99.     Having inaccurately marked the tradeline as *previously* disputed while failing to indicate that the tradeline was actively disputed, NCB's investigation was inherently unreasonable.

### Failure to report disputed debt as disputed

100.     In September 2020, NCB made *new* reports to Experian which contained a new balance date and other updated information, and also contained the CCC of "XH" meaning "account **previously** in dispute – investigation complete, reported by data furnisher." (**Emphasis added**.) **SEE PLAINTIFF'S EXHIBIT C.**

101.     NCB continued to be obliged to disclose the fact that the Debt was disputed in all communications about the Debt, in response to the dispute in August 2020 report to Experian. *See Semper v. JBC Legal Group*, 2005 WL 2172377 (W.D. Wash. Sept. 6, 2005).

102.     Despite having no reason to believe that Mr. Evans no longer disputed the Debt, NCB falsely communicated that the Debt was no longer disputed.

103.   NCB had no right to determine on its own whether the dispute had merit or not; the FDCPA requires a debt collector to communicate that a debt is disputed, and 1692e(8) "does not require an individual's dispute be valid or even reasonable. Instead, the plaintiff must simply make clear that he or she disputes the debt. *DeKoven v. Plaza Assocs.*, 599 F.3d 578, 582 (7th Cir. 2010) ("[A] consumer can dispute a debt for 'no reason at all ….'").

104.   NCB should have continued to report the Debt with the notation, "account information disputed by consumer."

105.   The distinction between reporting a debt as "previously in dispute" and "currently in dispute" is significant since many commercially used credit scoring algorithms disregard a collection account from their score computations if the account is reported as *currently* in dispute, but do not disregard accounts marked as *previously* in dispute.

106.   NCB's failure to disclose that the Debt was currently disputed materially damaged Mr. Evans's credit scores.

107.   The failure to properly report a disputed debt as disputed creates a concrete injury-in-fact because the failure to disclose this information affects credit scores, meaning Mr. Evans suffered "a real risk of financial harm caused by an inaccurate credit rating." *Evans v. Portfolio Recovery Associates*, 889 F. 3d 337, 345 (7th Cir 2018).

## NCB Collection Attempts Continue

108.    Shortly thereafter the dispute made by Mr. Evans in August 2020, he started to receive collection letters from NCB, offering discounts on the usurious, legally-unenforceable and disputed debt. **SEE PLAINTIFF'S EXHIBIT D.**

109.    The collection letter offered to resolve the debt for 25% of the claimed balance and stated, "To take advantage of this option, we request that you call our office by October, 30, 2020". *Id.*

110.    An unsophisticated consumer would be misled into believing that this offer was legal, albeit the loan was unenforceable to begin with.

111.    Mr. Evans, under the impression that the loan was enforceable, decided to take advantage of the 75% discount of his current balance.

112.    The cumulative effects of NCB's credit reporting and mail solicitations resulted in Mr. Evans paying $889.90 to NCB he would not have paid, absent NCB's false and misleading representations that the debt was legitimately owed.

113.    NCB then used the proceeds for the collection of this unlawful debt to further its continuing enterprises, including the purchase of additional portfolios unlawful debt.

114.    Further, NCB's collection agents represented to Mr. Evans that payment of the $889 would "clear" his credit report.

115.   In reality, NCB simply reported the account to Experian as a "paid collection," which, while disclosing the consumer has paid the debt, continues to leave a record of the prior delinquency reporting and adversely effects a consumer's credit score, pursuant to many commonly-used credit scoring models.

### NCB Discloses Legally-Protected Information to 3rd Parties

116.   NCB sent several collection letters to Mr. Evans, including the one sent in October 2020. **SEE PLAINTIFF'S EXHIBIT D.**

117.   Rather than prepare and mail a collection letter on its own, NCB sent information to a commercial mail house.

118.   NCB disclosed to the mail house:

   a.  Mr. Evans' status as a debtor,

   b.  the amount of the alleged debt Republic Bank & Trust Co.,

   c.  the original account number relating to the Debt, and

   d.  other highly personal pieces of information.

119.   The mail house then populated some or all of this information into a pre-written template, printed, and mailed the letter to Mr. Evans' residence in Florida. Id.

120.   The term "communication" is defined in the FDCPA, 15 U.S.C. §1692a(3), as "the conveying of information regarding a debt directly or indirectly

to any person through any medium," which includes sending an electronic file containing information about Mr. Evans' purported Debt to a mail house.

121.   NCB's communication to the mail house was in connection with the collection of a Debt since it involved disclosure of the Debt to a third party with instructions to produce a collection letter and mail it to Mr. Evans, the consumer, with the objective that the correspondence would motivate the consumer to pay some or all of the alleged *and* unenforceable Debt.

122.   This mail house is a distinct entity not owned by NCB.

123.   This mail house is not a consumer reporting agency as referenced in 15 U.S.C. §1692c(b).

124.   This mail house is not an attorney as referenced in 15 U.S.C. § 1692c(b).

125.   Mr. Evans never consented to having his personal and confidential information, concerning the Debt or otherwise, shared with any mail house.

126.   15 U.S.C. § 1692c(b) states that:

> "Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a post judgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector." (emphasis added).

127.   The mail house used by NCB as part of its debt collection effort against Mr. Evans does not fall within any of the categories listed within 15 U.S.C. § 1692c(b).

128.   Due to NCB's communication to this mail house, information about Mr. Evans, including his name, other personal information, and the amount he supposedly owes, are all within possession of a third party not expressly listed within 15 U.S.C. § 1692c(b).

129.   Thus, NCB disclosed information about Mr. Evans, his status as a debtor, and other information in violation of 15 U.S.C. § 1692c(b). See *Hunstein v. Preferred Collection & Mgmt. Servs.*, No. 19-14434 (11th Cir. Apr. 21, 2021).

130.   If a debt collector "conveys information regarding the debt to a third party – informs the third party that the debt exists or provides information about the details of the debt – then the debtor may well be harmed by the spread of this information." *Brown v. Van Ru Credit Corp.*, 804 F.3d 740, 743 (6th Cir. 2015).

131.   Communications from debt collectors to mail houses are not exempt from the provisions of 1692c(b) and are "in connection with" the collection of a debt. See Hunstein.

132.   NCB devised this strategy of communicating to a third-party mail house so that it could churn out more collection letters than if it kept all of the work "in house."

133.    This mail house strategy allowed NCB to generate more profit and gain an advantage over competitors.

134.    In reckless pursuit of these business advantages, NCB disregarded the known, negative effects that disclosing sensitive and personal information to an unauthorized third party would have on a consumer.

135.    NCB's unauthorized and prohibited communications caused Mr. Evans, a consumer who highly values his privacy, significant emotional distress since his confidential, legally protected personal information had been unlawfully disseminated to third parties.

136.    Mr. Evans has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

**COUNT I**
**VIOLATIONS OF THE FDCPA**

137.    Mr. Evans adopts and incorporates paragraphs 1 – 136 as if fully stated herein.

138.    NCB violated **15 U.S.C. § 1692c(b)** when it disclosed information about Mr. Evans' purported Elevate debt to an unauthorized third-party mail house and the employees of that mail house in connection with the collection of the Debt.

139.    NCB violated **15 U.S.C. § 1692e and 1692e(10)** when it used misleading and deceptive means to attempt to collect a debt by attempting to

collect the Debt from Mr. Evans, a Florida resident, both in writing and via credit reporting, claiming a Debt from an unlicensed, non-bank entity, Elastic/Elevate, bearing annual interest exceeding 129%, was a legal, valid, and enforceable debt, when the Elastic Loan was null, void, and unenforceable under Florida law, and when it reported a disputed debt as "previously disputed" and "now resolved," despite this being false.

140. NCB violated **15 U.S.C. § 1692e(2)(a)** when it made a false representation about the character, amount and/or legal status of a debt by attempting to collect from Mr. Evans, a Florida resident, both in writing and via credit reporting, a Debt from an unlicensed, non-bank entity, Elastic, bearing annual interest exceeding 129%, was a legal, valid, and enforceable debt, when the Elastic Loan was null, void, and unenforceable under Florida law, and when it reported a disputed debt as "previously disputed" and "now resolved," despite this being false.

141. NCB violated **15 U.S.C. § 1692e(8)** when it communicated credit information which was false, and which NCB knew, or should have known was false, to wit, that a Debt from an unlicensed, non-bank entity, Elastic, bearing annual interest exceeding 129%, was a legal, valid, and enforceable debt, and that Mr. Evans thus actually owed the $3,660 balance, when he did not owe it as it was null, void and unenforceable against him pursuant to Florida law.

142.  NCB violated **15 U.S.C. § 1692e(8)** when it communicated credit information which was known to be disputed, without disclosure of dispute, reporting instead it was "previously disputed" and "now resolved," despite this being false.

143.  NCB violated **15 U.S.C. § 1692f** by using unfair means in connection with the collection a debt, to wit, knowingly disclosing sensitive personal information about Mr. Evans to third parties not expressly authorized under the FDCPA, and by claiming it was incumbent upon Mr. Evans to re-dispute a disputed debt, otherwise NCB would consider the debt non-disputed.

144.  NCB violated **15 U.S.C. § 1692f(1)** when it attempted to collect an amount not authorized by contract or law – to wit, the entire purported Elastic Loan debt-- from Mr. Evans through written demands and credit reporting, when the Elastic Loan was null, void, and unenforceable under Florida law.

145.  NCB's conduct renders it liable for the above-stated violations of the FDCPA, and Mr. Evans is therefore entitled to statutory damages not to exceed $1,000 as well as other relief.

146.  NCB intentionally made these communications in order to gain an advantage over other debt collectors and generate additional profits.

**WHEREFORE,** Mr. Evans respectfully requests that this Honorable Court enter judgment against NCB for:

a.  Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.  Unspecified actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.  Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.  Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE CRCPA

147.  Mr. Evans adopts and incorporates paragraphs 1 – 136 as if fully stated herein.

148.  NCB violated **Florida Statute § 772.103(3),** when they participated in an association with Elevate Credit, doing business as Elastic, through the collection of an unlawful debt – the Elastic Loan.

149.  NCB violated **Florida Statute § 772.103(4)** when it conspired and endeavored, with Elastic Elevate Credit, to collect an unlawful debt – the Elastic Loan – and to use any funds collected in furtherance of NCB's ongoing enterprise.

150.  The Defendants took action in furtherance of this conspiracy, including mailing a collection letter and reporting it to the nationwide CRAs as a purported unpaid debt, damaging Mr. Evans' credit and, in effect, holding his credit report hostage until he paid the unlawful debt.

151.   The Defendants have attempted to collect virtually-identical debts through credit reporting, phone calls, demand letters, and threats of litigation from hundreds, if not thousands, of other Florida residents.

**WHEREFORE,** Mr. Evans respectfully requests this Honorable Court enter judgment against NCB ordering:

a.   Threefold the amount of actual damages, which Plaintiff calculates to be a minimum of $889, or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to Florida Statute 772.104(1);

b.   Reasonable costs and attorneys' fees pursuant to pursuant to Florida Statute 772.104(1);

c.   An injunction of Estoppel against NCB from engaging in any further action in violation of Florida law, pursuant to Florida Statute 772.14; and,

d.   Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## <u>VIOLATIONS OF THE FCCPA</u>

152.   Mr. Evans adopts and incorporates paragraphs 1 – 136 as if fully stated herein.

153.   NCB violated **Section 559.72(5)**, **Florida Statutes**, when it disclosed to the Pennsylvania mail house, a third party, information that would affect Mr.

Evans' reputation, specifically personal details about Mr. Evans, and purported an unpaid, otherwise, unenforceable Elastic Loan. NCB was aware that there was no legitimate business need to convey this information, since NCB could easily have prepared and mailed the letter itself without any need to disclose the information to a third party.

154.    Instead, NCB *intentionally decided* to disclose this information to the Pennsylvania mail house as part of its debt collection effort against Mr. Evans because it allowed NCB to gain a competitive advantage over the competition through increased profit margins.

155.    NCB violated Section **559.72(9)**, **Florida Statutes**, when NCB attempted to collect the Elastic Loan from Mr. Evans via multiple collection letters mailed to him, when the Elastic Loan was illegitimate and unenforceable due to the application of interest rates in excess of 129% percent annually on the principal amount of the loan, in violation of Section 687.071, Florida Statutes, and NCB knew, or should have known, that the Elastic Loan was unenforceable in Florida.

156.    NCB violated Section **559.72(9)**, **Florida Statutes**, when NCB asserted rights which do not exist, specifically, the right to collect the Elastic Loan from Mr. Evans, when the loan was not legally owed pursuant to Florida law.

157.    NCB was in possession of the original loan documents and thus knew, or should have known, that the loan contained an illegal interest rate in Florida.

158.    NCB conduct renders it liable for the above-stated violations of the FCCPA, and Mr. Evans is therefore entitled to statutory damages not to exceed $1,000 as well as other relief.

159.    **WHEREFORE,** Mr. Evans respectfully requests this Honorable Court enter judgment against NCB for:

a.    Statutory damages of **$1,000.00** pursuant to Section 559.77(2), Florida Statutes;

b.    Actual damages pursuant to Section 559.77(2), Florida Statutes;

c.    Injunctive relief preventing NCB from attempting to collect the alleged loan from Mr. Evans pursuant to Section 559.77(2), Florida Statutes;

d.    Reasonable costs and attorney's fees pursuant to pursuant to Section 559.77(2), Florida Statutes; and,

e.    Such other relief that this Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE FCRA

160.   Mr. Evans adopts and incorporates paragraphs 1 –136 as if fully stated herein.

161.   NCB violated **15 U.S.C. § 1681s-2(b)** when it failed to make a reasonable investigation after notice of dispute from a CRA, Experian, since any

reasonable investigation would have concluded that NCB's report was no longer complete or accurate unless modified to include the fact that the Debt was disputed by the consumer, Mr. Evans. Instead, NCB reported information that it knew was false - that the account was *previously* disputed, implying that the dispute had been resolved and Mr. Evans simply refused to pay a debt which he now agreed he owed. Further, any reasonable investigation should have determined the Debt was not reportable at all as it was *void ab initio* due to its triple-digit interest rate.

162.   NCB's conduct was willful and intentional, or alternately, was engaged in with a reckless disregard for consumer rights and failed to conform to established Metro 2 standards which NCB had pledged to follow.

163.   NCB is liable under the FCRA to Mr. Evans in a statutory amount up to $1,000 *per incident*.

**WHEREFORE,** Mr. Evans respectfully requests this Honorable Court to enter judgment in his favor, and against NCB, for:

a.   The greater of Mr. Evans's actual damages or statutory damages of **$1,000** per incident pursuant to 15 U.S.C. § 1681n(a)(1)(B) or 15 U.S.C. § 1681o(a)(1);

b.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) or 15 U.S.C. § 1681o(a)(2); and,

c.      Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Evans hereby demands a trial by jury on all issues so triable.

Respectfully submitted on September 15, 2021, by:

**SERAPH LEGAL, P. A.**

*/s/ Thomas M. Bonan*
Thomas M. Bonan Esq.
Florida Bar No.: 118103
TBonan@SeraphLegal.com
1614 N 19th Street
Tampa, Florida 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A      NCB's Florida CCA License Record
B      Elastic Financial, LLC's Trademark
C      Plaintiff's Experian Consumer Disclosure Dated March, 17, 2021 – Excerpt
D      NCB's Collection Letter to Plaintiff Dated October 6, 2020 - Excerpt